**Herman COHEN et al.**

v.

**Frank S. HOYE et al.**

Supreme Judicial Court of Maine.

Aug. 19, 1971.

William P. Donahue, Biddeford, for appellants.

Hugh G. E. MacMahon, Portland, E. Stephen Murray, Asst. Atty. Gen., Augusta, for appellees.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

The case is before this Court on appeal from a judgment entered in the Superior Court (York County) which, upon motions to dismiss filed by defendants, dismissed the complaint for "failure to state a claim upon which relief can be granted." Rule 12(b) (6) M.R.C.P.

The complaint of plaintiffs, who are residents, voters and taxpayers of the Town of Kennebunk, names as the defendants: (a) the directors of School Administrative District No. 71, (b) the members of the State Board of Education, (c) the State Commissioner of Education and (d) the State Attorney General. The complaint seeks (1) a declaratory judgment that 20 M.R.S.A. § 222 is unconstitutional because its provisions

"require a ⅔rd affirmative vote for passage of a petition for dissolution of

a school administrative district \* \* \* and that an affirmative vote of a majority only is required";

and (2)

"That the defendants, directors of School Administrative District No. 71, be enjoined from administering the schools of Kennebunk and Kennebunkport, in that inadequate representation of only six members for the Town of Kennebunk violates the one man-one vote rule guaranteed by the fourteenth amendment to the Federal Constitution, and that the other defendants be restrained from abetting the Directors in the illegal administration of said schools."

Other subsidiary aspects of the complaint allege that the validating provisions of §§ 22–24 of Chapter 150 of the Private and Special Laws of 1969, the arrangements for determining the number and apportionment of directors to serve on the Board of the District (as contained in 20 M.R.S.A. § 303) and the manifold "guidelines" relating to School Administrative Districts delineated throughout 20 M.R.S.A. are illegal.

The factual allegations of the complaint provide a history by which the Towns of Kennebunk and Kennebunkport (under authority of 20 M.R.S.A. §§ 211–411, as amended) had created, and rendered operative, School Administrative District No. 71 in September and October of 1968.

On September 30, 1968 the voters of each of the Towns had accepted a proposal to form a School Administrative District (pursuant to 20 M.R.S.A. § 215 as amended by P.L.1965, c. 194, §§ 1 and 2, P.L.1965, c. 513, § 29–A, and P.L.1967, c. 483, § 1). Included in the proposal accepted was an Article fixing at ten the number of directors to serve on the Board of School Directors and apportioning to Kennebunk 6 and to Kennebunkport 4.[1] The approving vote was 574 yes, 557 no, in the Town of Kennebunk and in the Town of Kennebunkport 447 yes, 101 no.

It is further alleged that immediately after an inspection and recount of the ballots in the Town of Kennebunk

"\* \* \* ten or more voters of the Town of Kennebunk, by written petition, requested the Selectmen to call a special town meeting for submission to the voters of the following article of business:

"SHALL THE MUNICIPALITY VOTE TO RESCIND ITS PRIOR ACTION TO JOIN WITH THE MUNICIPALITY OF KENNEBUNKPORT TO FORM A SCHOOL ADMINISTRATIVE DISTRICT."

According to the complaint, "the Selectmen unreasonably refused to act upon said petition." Although a warrant was later issued by a Justice of the Peace for an election on November 3, 1968, to vote on rescission of the vote of approval,[2] this election was never held. The reason was that prior to November 3, 1968 the State Board of Education had issued a certificate of organization of School Administrative District No. 71.[3]

---

1. 20 M.R.S.A. § 301 requires that the Board of School Directors of a School Administrative District shall consist of a minimum of 5 members and that each participating municipality must have at least 1 director. Except for these statutory mandates as to minimums, statute (20 M.R.S.A. § 215) authorizes representatives of the municipalities involved, by statutorily designated procedures, "to determine a fair and equitable number of school directors to be elected by and to represent each participating municipality."

2. 30 M.R.S.A. § 2051–4 provides:
   "If the selectmen unreasonably refuse to call a town meeting, it may be called by a justice of the peace in the county on the written petition of a number of voters equal to at least 10% of the number of votes cast in the town at the last gubernatorial election, but in no case less than 10."

3. Under 20 M.R.S.A. § 216, as amended, it is provided:
   "If the board finds that a majority of the residents within each of the munici-

Approximately eleven months thereafter (September 17, 1969), and upon a petition for dissolution of School Administrative District No. 71,[4] the voters of the Town of Kennebunk voted 927 in favor of, and 673 against, dissolution. Because this vote (although a simple majority) was less than the ⅔rds majority required by 20 M.R.S.A. § 222, School Administrative District No. 71 continued operation in violation, as plaintiffs maintain, "of the equal protection clause of the Fourteenth Amendment to the Federal Constitution." It is plaintiffs' contention that, consistently with the Fourteenth Amendment, "only a majority vote can be required" to launch dissolution proceedings. The violation, plaintiffs further assert, has been compounded by the refusal of the Administrative District's Board of School Directors (a) to acknowledge the controlling effect of the majority vote favoring dissolution, (b) to adopt a resolution declaring the ⅔rds requirement of the statute a nullity, and (c) to recognize the majority vote as sufficient to initiate the procedures ultimately to achieve dissolution.[5]

We conclude that the positions taken by the plaintiffs in their complaint are erroneous. We affirm the judgment dismissing the complaint for failure to state a cause of action.

We direct consideration, first, to the subsidiary contentions that: (1) the refusal of the Selectmen of Kennebunk in early October 1968 to allow a vote to rescind the prior action approving the joinder with Kennebunkport to form a School Administrative District was (in respects left vague and undefined in the complaint) improper; (2) the issuance by the State Board of Education of a certificate of organization under 20 M.R.S.A. § 216 was illegal; (3) the validation provisions of P.L.1969, Chapter 150, §§ 22–24, inclusive, are invalid; and (4) the "guide-lines" comprehended under the entirety of 20 M.R.S.A. relative to School Administrative Districts are "unconstitutional."

Examination of the entirety of the case convinces us that plaintiffs themselves assert these contentions only as secondary aspects of the alleged applicability of the

palities involved, voting on each of the articles or questions submitted to them, have voted in the affirmative, and have elected the necessary school directors to represent each municipality, and that all other steps in the formation of the proposed School Administrative District are in order and in conformity with law, the board shall make a finding to that effect and record the same upon its records. The board shall further assign a number to each School Administrative District so formed in the order of their formation in the following form, 'School Administrative District No. ——,' which shall be the official title of the School Administrative District.

"The board shall, immediately after making its finding, issue a certificate of organization in such form as the board shall determine. * * * The issuance of such certificate by the board shall be conclusive evidence of the lawful organization of the School Administrative District. * * *"

4. 20 M.R.S.A. § 222 says, in part:
"When the residents of a participating municipality desire to petition for dissolu-

tion of a School Administrative District, such petition shall become effective when approved by a ⅔ vote of the legal voters in said municipality present and voting at a special meeting, called and held in the manner provided by law for the calling and holding of town meetings or city elections."

5. These procedures would "permit the voters of Kennebunk and Kennebunkport to vote upon the issue" and to decide, as provided in 20 M.R.S.A. § 222 whether, as an incident of dissolution procedures effectively initiated,
"a majority of the voters [of both of the municipalities constituting School Administrative District No. 71] voting on the article [as prepared by an agreement of dissolution entered into between the two participating municipalities] have voted in the affirmative * * * [thereby imposing a duty upon the State Board of Education to] notify the directors of the district to * * * execute the terms of the agreement for dissolution."

so-called "one man-one vote" principle. Thus, the four ancillary issues are developed by plaintiffs as incidents of the primary overall attack levelled against the constitutionality of the ⅔rds vote required for approval of an original petition for dissolution and the 6/4 ratio of representation upon the School Administrative District's Board of Directors. Disposition of these major matters will automatically resolve the subsidiary questions.

The precise issue presented by the alleged unconstitutionality of a ⅔rds majority vote requirement for the initial approval of a petition originating dissolution procedures of a School Administrative District is whether the Fourteenth Amendment to the Federal Constitution prohibits a State from requiring more than a simple majority vote in a local referendum which relates to issues concerning the education of children (arguably, an "important governmental" concern). Plaintiffs have repeatedly emphasized that they are raising the issue in this narrow form. Their prayer for declaratory judgment seeks adjudication that the requirement of

> "a ⅔rd affirmative vote for passage of the petition for dissolution of a school administrative district is unconstitutional *and that an affirmative vote of a majority only is required.*" (emphasis supplied)

In their brief plaintiffs argue:

> " * * *, the issue in this case is whether the principle of a local referendum is to be decided by a majority vote and not a ⅔rds majority vote as applicable",

such that

> "the one man-one vote rule requires that the provisions of Section 222 of Title 20 Maine Revised Statutes Annotated, requiring a ⅔rds affirmative vote, be declared unconstitutional * * *."

The case is thus devoid of any claim that extraneous factors which lack a reasonable relationship to the subject-matter of the election (or to the various interests in that subject-matter which those participating in the election as voters would be expected to seek to express by their votes) had been utilized as a basis for a dilution of voting power. Likewise absent is prior identification of any group of voters reasonably recognizable as a category of votes which would be similarly cast, on one side or the other of the subject-matter of the election, and as to whom the statute has purported to effect either a diminution, or a denial, of voting power.

The contention of unconstitutionality is here confined, as the record reveals it must be, to the bare proposition that

> "when a two-thirds majority is required, each opponent of the issue in effect casts two votes for only one dropped in the ballot box by proponents with the likely result that the issue will be defeated."

The argument is that when issues relating to public education of children are submitted to the electorate for determination, the people are directly deciding matters importantly governmental in nature and, therefore, a departure from the principle of *strict majoritarian supremacy*—because it affords the minority disproportionate impact upon the outcome of the election—contravenes the Fourteenth Amendment to the Federal Constitution.

The exact issue has been recently decided adversely to the position of the plaintiffs by the Supreme Court of the United States. Gordon et al. v. Lance et al., 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971). That Court said of requirements contained in the Constitution and certain statutes of West Virginia—that 60% of the voters of a political subdivision of the State must approve, in a referendum election, the incurring of bonding indebtedness or an increase in tax rates (beyond those specified in the West Virginia Constitution):

> "Although West Virginia has not denied any group access to the ballot, it has in-

deed made it more difficult for some kinds of governmental actions to be taken. Certainly any departure from strict majority rule gives disproportionate power to the minority. But there is nothing in the language of the Constitution, our history or our cases that requires that a majority always prevail on every issue." (91 S.Ct. 1889, 1892, 29 L.Ed.2d 273, 276)

After a review of various specific instances in which the Federal Constitution, as well as the Constitutions of many States, remove "entire areas of legislation" as well as other issues "from the concept of majoritarian supremacy", the Supreme Court of the United States has promulgated in Gordon v. Lance, supra, a definitive, generalized principle:

"We conclude that so long as such provisions do not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause." (91 S.Ct. 1889, 1892, 29 L.Ed.2d 273, 277)

The decision of Gordon v. Lance, supra, is dispositive of the issue here under consideration—whether statutory provisions which are without actual, or potential, invidiously discriminatory effect against "any identifiable class" violate the Fourteenth Amendment to the Constitution of the United States *solely* because they depart from the concept of "strict majoritarian supremacy." Gordon v. Lance, supra, settles that, *by itself*, departure from simple majoritarianism offends neither the Equal Protection Clause nor "any other provision of the Constitution." (91 S.Ct. 1889, 1893, 29 L.Ed.2d 273, 278)

■ The Supreme Court of the United States has explicitly reserved decision upon the constitutionality of a provision which might require "unanimity or giving a veto power to a very small group" (see Footnote 6 of Gordon v. Lance, supra). It is manifest, however, that a repository of veto power in a minority constituted by more than ⅓ of those voting (as in the case at bar) lies outside the concept imported by a "very small group." While Gordon v. Lance, supra, itself focussed upon a minority of more than 40%, other decisions of the Supreme Court of the United States rendered simultaneously with, and based upon, Gordon v. Lance show indisputably that veto power in a minority of more than 33⅓% is constitutionally tolerable.

Bogert v. Kinzer, 403 U.S. 914, 91 S.Ct. 2224, 29 L.Ed.2d 691 (1971) (on the authority of Gordon v. Lance dismissing, for want of a substantial federal question, the appeal from the decision of the Supreme Court of Idaho that Idaho's constitutional and statutory requirement of a two-thirds majority approval of a local government's issuance of general obligation bonds is consistent with the Federal Constitution and the "one man, one vote" principle).

Mihaly v. Westbrook, 403 U.S. 915, 91 S.Ct. 2224, 29 L.Ed. 692 (1971) (vacating judgment and remanding to the Supreme Court of California, on the authority of Gordon v. Lance, for reconsideration of the decision that the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States invalidiates California's constitutional requirement of two-thirds electoral majority to approve local government's general obligation bond proposals).

Brenner v. Kansas City School District, 403 U.S. 913, 91 S.Ct. 2225, 29 L.Ed.2d 692 (1971) (on the authority of Gordon v. Lance, affirming the judgment entered in the United States District Court, Western Missouri, that Missouri's constitutional and statutory two-thirds majority requirement for school tax levy and bonds is constitutionally valid).

■ The question before us is the constitutionality, rather than the wisdom, of the legislature's choice, in this instance, to depart from the principle of "strict majoritarian supremacy". We decide that the

legislature acted constitutionally [6] in requiring a ⅔rds majority vote of approval to render effective a petition for origination of procedures for the dissolution of a School Administrative District.

■ The attack of plaintiffs upon the constitutionality (under the Constitution of the United States) of the apportionment of Directors of the School Board of School Administrative District No. 71,—a total number of 10 with 6 representing Kennebunk and 4 Kennebunkport,—is likewise without merit.

Plaintiffs rely heavily for support of their position upon the decision of the Supreme Court of the United States in Hadley v. Junior College District of Metropolitan Kansas City et al., 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). It is true that in Hadley, supra, the Court observed that

"Education has traditionally been a vital governmental function" (p. 56, 90 S.Ct. p. 795)

and further noted that directors of a School Board, in light of their specific duties in a given instance, could well be

"government officials in every relevant sense of that term" (p. 56, 90 S.Ct. p. 795)

rather than

"functionaries whose duties are * * * far removed from normal governmental activities." (p. 56, 90 S.Ct. p. 795)

We find unnecessary to decide in the present case whether this language in Hadley, supra was intended by the Supreme Court of the United States to signify that every director of every School Board automatically becomes a "governmental official" solely because he has some duties relating to the subject matter of education. Even were we to accept, arguendo, the premise that the School Board directors with whom we are here concerned, in light of the specific duties which they perform, are "governmental officials" rather than "administrative functionaries",[7] we conclude that the decision of Hadley, supra, is inapplicable to the facts before us. Hadley, supra, predicated unconstitutionality of the representation there involved upon the existence of a "systematic discrimination against voters in the more populous school districts", a built-in discrimination constituted by the facts that a large district was always allocated the number of trustees corresponding to the bottom of that percentage range within which its percentage of the total enumeration would fall. In the case at bar there is absent a legally prescribed systematic, built-in discrimination against Kennebunk in the proportion of directors allowable to that municipality. The statute here involved establishes a voluntary arrangement founded upon negotiation for the determination, consistently with unobjectionable statutorily mandated minimums, of the number and apportionment of directors to serve on the Board of the School Administrative District. The negotiations for this purpose are undertaken by

"the municipal officers and the members of the school committee in the municipalities within the proposed School Administrative District." (20 M.R.S.A. § 215–2)

The statute specifies that at the meeting in which these negotiations are conducted there must be present

6. The reference is to the Federal Constitution, no independent issue having been conceived to exist, in this respect, under the Constitution of the State of Maine.

7. In Bergerman v. Lindsay, 25 N.Y.2d 405, 306 N.Y.S.2d 898, 255 N.E.2d 142 (1969), cert. den. 398 U.S. 955, 90 S.Ct. 2173, 26 L.Ed. 2d 540 (1970), it was held that the

"one-man, one-vote" principle was inapplicable to a Board of Estimates, constituted by representatives of admittedly malapportioned boroughs, because the Board of Estimates, regardless of its role in preparing the city budget, was deemed to be a body acting without legislative powers or functions.

"at least ½ of the total number of municipal officers and school committee members eligible to attend and vote"

before action establishing the number and proportion of directors can be taken. (20 M.R.S.A. § 215–3) The purpose of the meeting and the negotiations conducted at the meeting is to decide

"a fair and equitable number of school directors to be elected by and to represent each participating municipality." (20 M.R.S.A. § 215–3)

The number and apportionment determined by the municipal officers and school committee members of the participating municipalities must then be presented to the voters of each proposed participating municipality for approval along with the vote on the articles relating to the formation of the School Administrative District. (20 M.R.S.A. § 215–3)

■ We decide that these statutory provisions, authorizing determination of the number and apportionment of directors on the Board of the School Administrative District on a basis of negotiations guided by the criterion that the conclusions be "fair and equitable", are constitutionally sound. The present situation is governed by the principle already announced by the Supreme Court of the United States in *Hadley,* supra, that a claim of unconstitutionality fails

"if the deviations from equal apportionment presented * * * resulted from a plan that did not contain a built-in bias in favor of small districts, but rather from the inherent mathematical complications in equally apportioning a small number of trustees among a limited number of component districts. * * * mathematical exactitude is not required, Westberry, *supra,* 376 U.S. at 18, 84

S.Ct. at 535, Reynolds, *supra,* 377 U.S. at 577, 84 S.Ct. at 1389; * * *." (397 U.S. p. 58, 90 S.Ct. p. 796)

Upon principles of "fairness and equity" voluntary negotiations had here resulted in a representative determination that the total number of directors of the Board of the School Administrative District should be 10. In light of the size and constituency of the School Administrative District (only two municipalities participating), this decision that the Board of Directors should be constituted by 10 persons must be deemed reasonable under all the circumstances. Neither the Federal Constitution nor the United States Supreme Court demands, merely to avoid mathematical inexactitude, that a Board of Directors be unduly enlarged beyond limits set by convenience or other considerations deemed relevant and fair by the participants. Hence, regardless of the specific criterion which might be utilized to achieve adequate apportionment of 10 Directors between two "unequal" towns, "inherent mathematical complications" will inevitably arise in the apportionment of these 10 Directors as between the "limited number of component" participating municipalities. "Mathematical exactitude" being impossible since human beings cannot be dissected, the ratio of 6 to 4, fixed by negotiation and voter approval, is as good as is. constitutionally required.

"* * * the machinery of government would not work if it were not allowed a little play in its joints." Bain Peanut Co. v. Pinson, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482 (1931).

The complaint fails to state a claim upon which relief can be granted. It was correctly dismissed for this reason.

The entry is:

Appeal denied.